UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

STEVEN ROBERT HIRTZINGER,                    Case No. 06-CV-1609 (PJS/RLE)

                Plaintiff,

v.                                           ORDER GRANTING DEFENDANT'S
                                             MOTION FOR SUMMARY JUDGMENT
PINNACLE AIRLINES, INC.,
a Delaware corporation d/b/a Northwest
Airlink a/k/a Express Airlines I, Inc.,

                Defendant.

---

Ian S. Laurie and Gerald T. Laurie, LAURIE & LAURIE, for plaintiff.

W. Chris Harrison, PINNACLE AIRLINES, INC.; and Alec J. Beck, SEATON BECK PETERS, P.A., for defendant.

On December 22, 2004, Pinnacle sought the assistance of the Transportation Safety Administration ("TSA") in investigating whether one of its flight attendants, plaintiff Steven Hirtzinger, had been responsible for a series of incidents in which safety equipment on Pinnacle airplanes appeared to have been vandalized or stolen. Hirtzinger was arrested later that day by the Federal Bureau of Investigation ("FBI"). On January 4, 2005, Hirtzinger was indicted on federal charges of tampering with aircraft safety equipment, but, a couple of months later, the government dismissed all charges. Hirtzinger then sued Pinnacle for, among other things, defamation, malicious prosecution, and negligent infliction of emotional distress.[1] This matter is

---

[1] Hirtzinger brought a number of other claims, most of which the Court previously dismissed. *See* Docket No. 17. Hirtzinger did not respond to Pinnacle's motion for summary judgment insofar as that motion pertained to his remaining negligence claim or his potential state-law claim of retaliation. The Court regards these two claims as abandoned. Even if the claims had not been abandoned, the Court would dismiss them on the merits for the reasons stated in Pinnacle's briefs.

before the Court on Pinnacle's motion for summary judgment.  For the reasons set forth below, the motion is granted.

## I.  BACKGROUND

Pinnacle is a regional carrier for Northwest Airlines.  Pinnacle maintains its headquarters in Memphis and a hub in Minneapolis.  The carrier flies small jets staffed by two pilots and one flight attendant.  Before every flight, the flight attendant is required to inspect certain safety equipment in the cabin of the aircraft, including fire extinguishers, sealed bags containing personal breathing equipment ("PBE"), D-rings (small metal rings attached to ropes used during emergency evacuations), and emergency lights.  Hirtzinger Dep. 32, 74-90.[2]  Flight attendants are supposed to report any problems with the safety equipment to the captain and to their manager.  Hirtzinger Dep. 91.  Such problems can result in flights being delayed or cancelled.

In late 2004, Gary Beek, a Minneapolis-based Pinnacle manager who oversaw operations in Milwaukee, was alerted by another Pinnacle employee to an unusually high number of problems with safety equipment on flights out of Milwaukee.  Beek Dep. 20-21, 26-28.  Beek had formed the same impression based on flight-safety reports that he had received.  Beek Dep. 29.  Moreover, Beek was particularly concerned about two reports that he received from Captain Michael Lorenz recounting safety-equipment problems on back-to-back flights to which both Lorenz and Hirtzinger were assigned.  Beek Dep. 30-32.  Specifically, on December 4, Hirtzinger reported that an exit-light cover was missing on a plane that Lorenz was preparing to

---

[2]All depositions cited are attached to the Sept. 6, 2007 affidavit of Ian S. Laurie [Docket No. 53] ("Laurie Aff.").

fly.  Crook Aff. ¶ 25 & Ex. G, Sept. 14, 2007 [Docket No. 60] ("Crook Aff.").[3]  The next day,

Hirtzinger claimed to have found the missing exit-light cover sitting on the sink in the bathroom

of that same airplane.  Crook Aff. Ex. G.  Hirtzinger also reported that the $CO_2$ cartridge was

missing from the rear fire extinguisher on that plane.  Crook Aff. ¶ 25 & Ex. G.

In addition to recounting the equipment problems — problems that Lorenz apparently

found suspicious — Lorenz also told Beek about what Lorenz regarded as odd behavior on

Hirtzinger's part.  Beek Dep. 32, 34, 37.  Specifically, Lorenz related that on December 5, after

his flight was cancelled due to the missing $CO_2$ cartridge, Lorenz had dinner with Hirtzinger and

another pilot.  Crook Aff. Ex. L.  During dinner, the other pilot observed that one of his recent

flights had likewise been cancelled when Hirtzinger claimed that safety equipment had

disappeared.  Crook Aff. Ex. L.  Hirtzinger denied being the flight attendant assigned to that

flight.  After being pressed by the other pilot, though, Hirtzinger admitted that he was indeed on

that flight.  Crook Aff. Ex. L.

During dinner, Hirtzinger also told the two pilots that both his father and brother were

employed as pilots by Northwest Airlines and that his brother was the youngest Northwest pilot

ever to operate a Boeing 757.  Crook Aff. Ex. L.  Lorenz evidently had difficulty believing these

claims, as he reported them to Beek.  Indeed, as Hirtzinger now admits, these assertions were lies

— and, it might be added, lies that could quite easily be exposed as lies (although Pinnacle did

_____

[3]There are three versions of this affidavit in the record.  Two of them are signed and
appear to be identical.  *See* Docket Nos. 60, 61.  The third, which is identified on the docket as
an "amended document," is unsigned.  *See* Docket No. 62.  Because the "amended" affidavit is
unsigned, the Court cannot rely on it.  The Court therefore cites to the first affidavit, *see* Docket
No. 60, although the Court notes that there appears to be no substantive difference between the
third affidavit and the first two affidavits.

not investigate the claims and confirm that they were lies until after it contacted the TSA on December 22). Hirtzinger Dep. 193; Crook Dep. 140-41.

Based on these reports and his conversations with other managers about problems with safety equipment on Milwaukee flights, Beek decided to gather more information about Pinnacle flights on which safety-equipment problems had been found. Beek Dep. 25-26. Beek asked his assistant, Darlene Dahlseide, to compile a spreadsheet detailing flights with safety-equipment problems. Beek Dep. 36, 40. After reviewing Dahlseide's compilation, Beek noticed that Hirtzinger was assigned to six of the flights in question. Beek decided to share the spreadsheet with Hirtzinger's supervisor, Sue Pelot, as well as with Pinnacle's vice-president of safety, Ed Fell, and with Pinnacle's security manager, Michael Crook. Beek Dep. 38, 45, 48. After seeing the spreadsheet, Pelot told Beek that she knew of two other safety-equipment incidents involving Hirtzinger, bringing the total to eight. Pelot Dep. 35-37; Laurie Aff. Ex. L. Dahlseide then apparently revised the spreadsheet to include the two additional incidents reported by Pelot. Pelot Dep. 38.

At Fell's request, Crook took over the investigation on December 18. Crook Dep. 10, 45. Crook was well-qualified to conduct the investigation. He had a master's degree in aeronautical science, specializing in human factors and aviation safety. Moreover, before becoming security manager for Pinnacle, he gained experience as a military investigator and interrogator. Crook Dep. 10, 95. After taking over the investigation, Crook gathered information about incidents in which safety equipment on Pinnacle planes was found to be missing or damaged in Milwaukee and in other cities. Crook Dep. 133-34. Crook also obtained copies of Lorenz's reports about Hirtzinger's odd behavior. Crook Aff. ¶¶ 4, 10; Crook Dep. 88.

After examining records for the period August 2004 to December 2004, Crook compiled a list of thirty-one flights on which safety equipment had been reported to be missing or damaged and on which Hirtzinger had served as the flight attendant.  Crook Aff. ¶ 25. According to Pinnacle, Hirtzinger flew just over 200 flights during this period, which means that there was a safety-equipment problem on about fifteen percent of his flights.  By comparison, Pinnacle experienced 445 similar safety-equipment problems on the over 200,000 flights that it flew in all of 2004, meaning that Pinnacle's overall safety-equipment-problem rate was about two-tenths of one percent.[4]  In other words, safety-equipment problems arose on Hirtzinger's flights during the period August 2004 to December 2004 about *seventy-five times* more frequently than they arose on Pinnacle flights during the year 2004.

The record is not clear whether Crook developed the full list of thirty-one incidents before or after he contacted the TSA on December 22.  It is clear, though, that before contacting the TSA, Crook reviewed maintenance records going back several months and found that Hirtzinger was the common element among numerous safety-equipment incidents.  Crook Aff. ¶ 12; Crook Dep. 75-76.  Likewise, although the record is not clear about when Crook calculated the precise discrepancy between the frequency with which safety-equipment problems arose on Hirtzinger flights and the frequency with which such problems arose on Pinnacle flights generally, it is clear that, before contacting the TSA, Crook had concluded that the frequency on Hirtzinger flights was disproportionately high.

---

[4]These numbers are based on Pinnacle's assertion that Hirtzinger flew "just over" 200 flights from August through December 2004, and that Pinnacle flew a total of 201,816 flights in 2004.  Pinnacle does not provide any record citation for these assertions, but Hirtzinger did not dispute them at oral argument.

Meanwhile, Crook was also receiving reports of new safety-equipment problems as they arose. On December 19 — the day after Crook took over the investigation — Pinnacle's maintenance department notified Crook of two incidents, one involving a broken safety seal on a fire extinguisher and the other involving a torn PBE bag. Crook Aff. ¶ 6. Hirtzinger was the flight attendant on the flight on which the torn PBE bag was found. Crook Aff. ¶¶ 7-8. The next day (December 20), Crook was told that an emergency exit light had gone missing on one of Hirtzinger's flights after a routine security sweep by maintenance the previous night had found nothing unusual. Crook Aff. ¶ 11.

In furtherance of his investigation, Crook decided to ask mechanics to conduct a few early-morning inspections of aircraft in Milwaukee, Indianapolis, and Minneapolis. Crook Dep. 132; Crook Aff. ¶ 18. Crook wanted to establish a "baseline" of all safety equipment being present and in good condition before any Pinnacle employees set foot on the planes. On December 21, Crook asked Curtis Kimball, a mechanic with Gearbuck Services,[5] to check over Pinnacle's airplanes in Milwaukee early the next morning. Crook Dep. 16-17. Because Crook considered Kimball and everyone else who had access to Pinnacle planes to be possible suspects, Crook first interviewed Kimball and conducted a criminal-background check on him. Crook Dep. 26-27. Based on the interview and the background check, Crook concluded that it was unlikely that Kimball was sabotaging safety equipment. Crook Dep. 27. Crook also thought Kimball was an unlikely suspect because some of the incidents that Crook was investigating had no connection to Milwaukee, where Kimball was stationed. Crook Dep. 53.

---

[5]Gearbuck Services was an outside contractor that maintained Pinnacle planes at the Milwaukee airport.

Hirtzinger was assigned to a plane scheduled to fly from Milwaukee to New York on the morning of December 22.  Early that morning, Kimball inspected the plane and found no problems with the safety equipment on board.[6]  Crook Aff. ¶¶ 19, 21.  A short time later, Hirtzinger arrived at the airport.  Hirtzinger Dep. 123.  Hirtzinger walked down the jetway to board the plane, but the other members of the flight crew had not yet arrived, and, although the door to the aircraft was open, the plane was dark.  Hirtzinger Dep. 123.  Hirtzinger claims that he did not board the aircraft.  Hirtzinger Dep. 125.  Instead, according to Hirtzinger, he left his luggage by the plane and returned to the gate to wait for the captain.  Hirtzinger Dep. 123, 125.  After about ten minutes, the captain arrived, Hirtzinger walked down the jetway with him, Hirtzinger and the captain boarded the plane, and Hirtzinger started his preflight inspection.  Hirtzinger Dep. 123.  Hirtzinger soon discovered a torn PBE bag in the rear of the plane and immediately notified the captain, who told Hirtzinger that the PBE bag located behind the captain's seat was also torn.  Hirtzinger Dep. 124.  The captain called the maintenance department and was told that the PBE in the torn bags was still usable for a period of forty-eight hours.  Hirtzinger Dep. 128.  The captain decided to proceed with the flight.

---

[6]The Milwaukee–New York flight to which Hirtzinger was assigned was flight number 2820, and the plane bore the tail number 8747B.  *See* Crook Aff. Ex. R at 1064, 460.  In the affidavit filed in support of the criminal complaint against Hirtzinger, TSA agent Edward Rooney correctly stated that Kimball inspected flight number 2820, but Rooney then incorrectly stated that the tail number on the plane was 8673D.  Laurie Aff. Ex. N ¶ 7.  Citing this discrepancy, Hirtzinger argues that Kimball inspected the wrong plane.  It appears that Rooney simply made an error of transcription, though; 8673D was the tail number of the plane on which Hirtzinger flew to Minneapolis later that afternoon, not the tail number of the plane on which Hirtzinger was supposed to fly to New York that morning.  Crook Aff. Ex. R at 1066.  In any event, what is important (for reasons that will be discussed below) is that Kimball *told* Crook that he had inspected the plane on which Hirtzinger was scheduled to fly to New York, and Crook had no reason to disbelieve Kimball.  Crook Aff. ¶¶ 19, 21; Crook Dep. 17.

A short time into the flight, Hirtzinger heard a "pop" followed by a hissing sound. Hirtzinger Dep. 132-33.  Hirtzinger looked around and discovered that one of the plane's portable oxygen bottles was leaking.  Hirtzinger Dep. 136.  Hirtzinger notified the captain, who decided to turn the plane around and go back to Milwaukee.  Hirtzinger Dep. 140.  The plane arrived in Milwaukee sometime between 9:00 a.m. and 10:00 a.m., after which the captain told Hirtzinger to wait in the gate area so that they could talk about the events of that morning. Hirtzinger Dep. 143, 146.  Hirtzinger did not see the captain again, but, after making several phone calls, Hirtzinger was eventually told that he should work a flight to Minneapolis that afternoon.  Hirtzinger Dep. 146-47.

The captain of the Milwaukee–New York flight apparently reported the incidents to someone who then relayed the information to Crook.  At that point, Crook believed that safety equipment on Hirtzinger's plane — safety equipment that had been inspected by Kimball shortly before Hirtzinger boarded the plane — had likely been sabotaged.  Understandably concerned, Crook contacted the Transportation Security Operations Command Center ("TSOCC"), which advised Crook to contact the TSA's Assistant Federal Security Director for Milwaukee, Edward Rooney.  Crook Dep. 19.  Crook contacted Rooney, and also placed a courtesy call to local law enforcement.  Crook Dep. 21, 56.  Crook told Rooney that Pinnacle had suffered a series of suspicious incidents involving safety equipment and asked to meet with Rooney in Milwaukee. Laurie Aff. Ex. N ¶ 3; Crook Dep. 75-76.

Crook and Brian Garceau (Pinnacle's director of maintenance) flew from Memphis to Milwaukee to meet with Rooney and further investigate the incidents of that day.  Garceau Dep. 9-10; Crook Dep. 111.  Crook, Garceau, and Carla Starck (a Pinnacle human-resources

representative) met with Rooney, and Kimball later joined them in order to answer questions. Crook Dep. 51, 54.  Crook described the events of the day to Rooney, showed Beek's spreadsheet to Rooney, and told Rooney that Hirtzinger seemed to be the common denominator with respect to that day's events and with respect to several other flights on which similarly suspicious incidents had occurred.  Laurie Aff. Ex. N ¶ 5; Crook Dep. 52, 56-57, 60-61.  Crook then asked for Rooney's input on how Pinnacle should proceed.  Crook Dep. 52.  At the conclusion of the meeting, Crook agreed to provide further information to Rooney as soon as Crook returned to Memphis.  Crook Dep. 55.

Meanwhile, Hirtzinger was preparing to work on the afternoon flight to Minneapolis. After Hirtzinger conducted a preflight inspection, he was told that another flight attendant would be working the flight instead of Hirtzinger.  Hirtzinger Dep. 148.  After the other flight attendant repeated the preflight inspection, Hirtzinger was put back on the flight and had to do yet another preflight inspection — the third.  Hirtzinger Dep. 148.  None of these inspections revealed any problems.  After the plane landed in Minneapolis, though, it was discovered that a $CO_2$ cartridge in a fire extinguisher had somehow been discharged.  Laurie Aff. Ex. N ¶ 9; Crook Aff. ¶ 25 & Ex. R at 1066.

When Hirtzinger disembarked in Minneapolis, he found Pelot (his manager) waiting for him.  Hirtzinger Dep. 154.  Pelot escorted him to a meeting with Starck (the human-resources representative), a union representative, and a TSA agent.  Hirtzinger Dep. 154-55, 179.  Starck began the meeting by going through a written list of safety-equipment incidents on Hirtzinger flights and asked Hirtzinger for an explanation of each.  Hirtzinger Dep. 180-81; Pelot Dep. 61-62.  Hirtzinger provided the explanations.  Pelot Dep. 62.  With respect to two of the incidents

(on December 13 and 14), Hirtzinger told Starck that he was out sick and thus had not worked on the flights in question.  Hirtzinger Dep. 181-82.  Starck then gave the list to the TSA agent. Hirtzinger Dep. 182.

The TSA agent sought to question Hirtzinger further, but Hirtzinger said that he wanted to consult with a lawyer before talking further about safety-equipment incidents.  Hirtzinger Dep. 182-83.  Hirtzinger was allowed to leave the meeting after the TSA agent told Hirtzinger that he would contact Hirtzinger after Christmas.  Hirtzinger Dep. 183-84.  Hirtzinger's employment was also placed "on hold" pending the outcome of Pinnacle's internal investigation. Laurie Aff. Ex. P.

Later that night, two FBI agents arrested Hirtzinger at his apartment.  The arrest was widely publicized, and Hirtzinger was understandably humiliated.  Hirtzinger Aff. ¶ 11.  There is, however, no evidence that anyone from Pinnacle asked that Hirtzinger be arrested or even knew that Hirtzinger would be arrested.  To the contrary, both Crook and Pelot testified that they were surprised by Hirtzinger's arrest.  Hirtzinger Dep. 184; Pelot Dep. 109-10; Crook Dep. 89-91.

A grand jury indicted Hirtzinger on January 4, 2005, on federal charges of tampering with aircraft safety equipment.  Laurie Aff. Ex. AA.  At some point in January, Hirtzinger was placed on the federal no-fly list, which resulted in the termination of his employment with Pinnacle.  Hirtzinger Aff. ¶ 16.  The government voluntarily dismissed the criminal charges against Hirtzinger in March 2005, Laurie Aff. Ex. V, but Hirtzinger remains on the federal no-fly list.  As a result, Hirtzinger cannot work as a flight attendant or travel anywhere by plane.

## II.  ANALYSIS

### A.  Standard of Review

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if the evidence is such that a reasonable jury could return a verdict for either party.  *Ohio Cas. Ins. Co. v. Union Pac. R.R.*, 469 F.3d 1158, 1162 (8th Cir. 2006).  In considering a motion for summary judgment, a court "must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the non-moving party."  *Winthrop Res. Corp. v. Eaton Hydraulics, Inc.*, 361 F.3d 465, 468 (8th Cir. 2004).

### B.  Defamation

Hirtzinger's defamation claim is somewhat unusual in that it focuses on what Pinnacle did *not* say to the TSA.  True, Hirtzinger complains that Pinnacle defamed him when it identified him to the TSA as the "common denominator" connecting numerous incidents of safety-equipment problems.  The problem for Hirtzinger, though, is that Pinnacle's statement was *true*; Hirtzinger was indeed the flight attendant on a large number of flights on which safety-equipment problems arose.  Thus Hirtzinger's real complaint seems to be that Pinnacle concealed from the TSA information that would have undermined any inference that Hirtzinger tampered with that safety equipment.  This allegedly withheld information included (1) positive

information about Hirtzinger, such as letters of commendation in his file and his supervisor's subjective belief that he had not tampered with equipment; (2) the fact that Pinnacle had experienced 445 similar safety-equipment discrepancies during the year 2004, including fourteen in December 2004 while Hirtzinger was out sick; (3) the fact that Pinnacle cannot tell the difference between damage to safety equipment caused by intentional tampering and damage resulting from normal wear-and-tear; and (4) the fact that Kimball inspected the wrong plane. Hirtzinger also points to two affirmative misstatements of fact — namely, that Hirtzinger was working on December 13 and 14 when safety-equipment discrepancies were found, and that Pinnacle was unaware of any reports of tampering on non-Hirtzinger flights.[7]

The parties agree that Minnesota law governs Hirtzinger's state-law claims.  Under Minnesota law, a statement is defamatory if: (1) it is false, (2) it is communicated to another, and (3) it tends to harm the plaintiff's reputation.  *Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252, 255 (Minn. 1980).  For purposes of its motion for summary judgment, Pinnacle does not dispute that its statements about Hirtzinger's involvement in damaging or stealing aircraft safety

---

[7]Hirtzinger also argues that the initial spreadsheet documenting a correlation between Hirtzinger and safety-equipment problems — which was prepared at the request of Beek, and which Crook showed to Rooney — is defamatory because it is entitled "Missing Equipment From CRJ Cabin — 2004," even though only five of the eight incidents listed involved missing (as opposed to damaged) equipment.  Laurie Aff. Ex. L.  Because not all of the incidents involve missing equipment, Hirtzinger argues, the spreadsheet is factually incorrect and therefore defamatory.

Hirtzinger does not contend that any of the information contained on the spreadsheet is false, however.  "If the statement is true in substance, inaccuracies of expression or detail are immaterial."  *Jadwin v. Minneapolis Star & Tribune Co.*, 390 N.W.2d 437, 441 (Minn. Ct. App. 1986).  Although the title of the spreadsheet may be technically inaccurate, the nature of each incident is clearly and accurately described within the spreadsheet.  The Court therefore holds that Beek's spreadsheet is not defamatory.

equipment were defamatory.  Rather, Pinnacle argues that its statements were protected by a qualified privilege.

## 1.  Qualified Privilege

For a defamatory statement to be protected by a qualified privilege, the statement must be made in good faith and on a proper occasion, from a proper motive, and with reasonable or probable cause.  *Bol v. Cole*, 561 N.W.2d 143, 149 (Minn. 1997).  "Qualified privilege applies when a court determines that 'statements made in particular contexts or on certain occasions should be encouraged despite the risk that the statements might be defamatory.'" *Id.* (quoting *Lewis v. Equitable Life Assurance Soc'y of the U.S.*, 389 N.W.2d 876, 889 (Minn. 1986)).  The defendant bears the burden of establishing the existence of a qualified privilege.  *Keenan v. Computer Assocs. Int'l, Inc.*, 13 F.3d 1266, 1269 (8th Cir. 1994).  Whether the statements were made on a proper occasion and from a proper motive are always questions of law.  *Id.* at 1270.  Whether the defendant had a reasonable basis for making the statement is a question of fact — although, as with any question of fact, if a reasonable jury could answer the question only one way (as is often the case), a court can grant summary judgment on the question.  *Id.*

The Court has no trouble concluding that Pinnacle's statements to the TSA — and, in particular, the statements Crook made to Rooney on December 22 — were made in good faith, on a proper occasion, and from a proper motive.  The context is critical.  This is not a case in which, say, a private citizen told the police that his neighbor was using drugs, or an employer told the police that an employee had been stealing merchandise.  Pinnacle is an airline, responsible for the safety of thousands of passengers.  The TSA is the federal agency most responsible for protecting the safety of airline passengers.  Reports by airlines to the TSA of

information regarding possible threats to the safety of airline passengers are precisely the type of statements that the qualified privilege was created to protect.  Airlines must err on the side of protecting the lives of their passengers; if airlines were chilled by the possibility of legal action from reporting suspicious incidents to the TSA, the consequences could be catastrophic.  It is difficult to imagine a good-faith report by an airline to the TSA of safety-related information that would not fall within the qualified privilege.

On December 22, Crook — Pinnacle's well-qualified security manager — was in the midst of investigating incidents of possible tampering with safety equipment.  The evidence that Crook had gathered indicated that Hirtzinger was connected to a disproportionate number of these incidents; the evidence did not point in a similar way to any other employee.  Against that backdrop, Crook learned of the apparent sabotage of safety equipment on Hirtzinger's flight to New York only a short time after Kimball had inspected that equipment and found no problem with it.  Crook found these incidents so troubling, and the circumstantial evidence implicating Hirtzinger so strong, that he concluded that it was time for Pinnacle to seek help from the TSA.

It must be stressed that Crook did not report to the TSA that Hirtzinger *had* sabotaged the equipment, much less that Hirtzinger should be arrested or charged with a crime.  In fact, Crook had no idea that the FBI would arrest Hirtzinger, and he was surprised at the speed with which the FBI acted.  Instead, as Crook's testimony makes clear, Crook was simply seeking help from the TSA with the investigation.  Obviously, the collective experience and resources that the TSA can bring to bear on such an investigation far exceed the collective experience and resources of

Pinnacle.[8]  It was entirely proper — indeed, laudable — for Pinnacle to seek help from the TSA in this situation.

Hirtzinger argues that Pinnacle's purpose in reporting him to the TSA was improper because the safety-equipment problems were merely "maintenance issues" that did not pose any kind of security threat.  The Court disagrees.  Properly functioning safety equipment can mean the difference between life or death in an aviation emergency.  That is why the equipment is on the plane, and that is why flight attendants must inspect the equipment before every flight.  Moreover, Pinnacle did not believe that it was merely experiencing "maintenance issues" with safety equipment; it suspected that someone was purposefully tampering with the equipment.  Even if tampering with safety equipment did not endanger safety — a facially absurd proposition — common sense dictates that a person who would repeatedly tamper with safety equipment might engage in other types of sabotage or aberrant behavior.  Regardless of the relative importance of the type of equipment at issue, then, Pinnacle was right to be concerned.

Similarly, the Court has little trouble concluding that Pinnacle had a reasonable basis to notify the TSA of its suspicions concerning Hirtzinger.  Pinnacle did not run to the authorities the moment that Beek first noticed that there seemed to be a correlation between Hirtzinger's presence and safety-equipment problems.  *Cf. Wirig v. Kinney Shoe Corp.*, 461 N.W.2d 374, 380 (Minn. 1990) (no reasonable basis for accusing plaintiff of theft where "no investigation occurred to substantiate the charges that [plaintiff] had stolen merchandise").  Instead, in

---

[8]Hirtzinger points out the lack of direct evidence, including fingerprint evidence, connecting him to any incidents of alleged tampering.  But the ready availability of fingerprint analysis and other sophisticated investigative techniques was one of the reasons why Crook contacted the TSA.  Crook Dep. 137-38.

response to Beek's suspicions, Pinnacle's managers set about gathering information from Pinnacle's files to try to determine if Beek's initial hunch was correct.  By the time he contacted the TSA, Crook had reviewed maintenance records going back several months and had found that Hirtzinger was the common element connecting multiple safety-equipment incidents during that period.  Crook was also aware that Hirtzinger had falsely denied being on a flight where a safety-equipment problem arose and had told two Pinnacle pilots a highly improbable story about his family's connections with Northwest Airlines — behavior that raised doubts about Hirtzinger's honesty.  Finally, Crook set up an inspection program to gather further information about the status of safety equipment on board Pinnacle's planes.  Shortly after the very first such inspection, three serious problems occurred on a plane to which Hirtzinger was the first person known to have post-inspection access.  All three of these incidents were quite unusual — two PBE bags were found "completely ripped open," Crook Dep. 42, and an oxygen bottle began leaking during the flight.  *See* Pelot Dep. 133-34 ("The items Steve was involved with were not normal wear and tear, they were unusual type things.").  Given all of the other evidence Crook had gathered, Crook had a reasonable basis to relay his suspicions to the TSA.

Hirtzinger has spent much of the past three years examining Pinnacle's actions under a microscope, without any of the urgency that Pinnacle was confronting at the time, and with the benefit of 20/20 hindsight unavailable to Pinnacle at the time.  Hirtzinger has cited a number of flaws with Pinnacle's investigation — things that it should have done, or done better, or thoughts that should have occurred to Pinnacle, or occurred to it sooner.  And Hirtzinger has done a good job:  He has unquestionably identified problems with Pinnacle's investigation — problems that may, in fact, have led the government to dismiss the criminal charges against him.

Before addressing these flaws individually, however, the Court must stress that, to be protected by the qualified privilege, Pinnacle was not required to acquire evidence establishing Hirtzinger's guilt beyond a reasonable doubt, or clear and convincing evidence of Hirtzinger's guilt, or even evidence that it was more likely than not that Hirtzinger was guilty. Requiring an airline to collect such evidence before it could even contact the TSA for help with an *investigation* would recklessly endanger the lives of airline passengers. Rather, to be protected by the qualified privilege, Pinnacle needed only a reasonable basis for suspecting that airline-safety equipment may have been sabotaged by Hirtzinger. Pinnacle could have had such a reasonable basis even if it conducted only a partial or flawed investigation — and even if the information on which it relied was tentative or uncertain or capable of being impeached. Pinnacle was not a court conducting a criminal trial of Hirtzinger; it was an airline reporting suspicions about Hirtzinger to federal law enforcement authorities, in the hope that those authorities would then help Pinnacle determine if Hirtzinger was, in fact, sabotaging safety equipment. Having carefully examined the record, the Court is satisfied that no reasonable jury could find that the flaws that Hirtzinger identifies deprived Pinnacle of a reasonable basis for reporting its suspicions to the TSA.

Turning now to those flaws: Two of the more serious flaws that Hirtzinger identifies concern the December 22 inspection of Hirtzinger's plane. Hirtzinger argues that the inspection did not provide a reasonable basis for accusing him of anything because Kimball, the Gearbuck mechanic who conducted the inspection, was himself a "prime suspect" until shortly before the inspection. Pl.'s Mem. Resp. Mot. Summ. J. 37 [Docket No. 52]. Not only did this fact cast doubt on the veracity of Kimball's assertion that the equipment was in good working order,

Hirtzinger argues, but it also provided a motive for Kimball to pin the blame on Hirtzinger and thereby deflect blame from himself.

The record does not support these arguments. It is true that, at one time, Crook considered *everyone* who had access to Pinnacle planes — including Kimball — as a possible suspect. But Crook never considered Kimball to be a "prime suspect" (as Hirtzinger alleges), nor did Crook ever acquire evidence pointing to Kimball. Hirtzinger identifies no specific reason why Crook or anyone else at Pinnacle should have suspected Kimball of tampering with safety equipment.

Moreover, there is no evidence in the record that Kimball regarded himself as a suspect. Likewise, there is no evidence in the record that Kimball was aware that *Hirtzinger* was a suspect at the time that Kimball inspected the plane. *See* Crook Dep. 54 ("Normally didn't speak much about Mr. Hirtzinger particularly with Kimball present."). In fact, there is no evidence that either Crook or Kimball even knew that Hirtzinger was scheduled to fly out of Milwaukee on December 22; indeed, the record implies otherwise. *See* Crook Dep. 129-30 ("the actual inspection program that was set up was not intentionally set up for — to look for one specific person. It just — coincidentally, Mr. Hirtzinger happened to be the individual who was working that flight that morning."). To suggest that Kimball could have framed Hirtzinger by damaging safety equipment on the plane scheduled to fly to New York is thus rank speculation — speculation that is not grounded in logic, much less in evidence.[9]

_____

[9]Hirtzinger complains of the disparity in treatment accorded to him and Kimball: Whereas Crook ruled out Kimball as a possible suspect on the basis of a personal interview (and a criminal-history check), Crook never interviewed Hirtzinger (who, like Kimball, had no criminal record). But obviously Kimball and Hirtzinger were not similarly situated. Crook had specific reasons to suspect Hirtzinger of tampering, but no reason to suspect Kimball, other than

The other alleged flaw with Kimball's inspection, according to Hirtzinger, is that Kimball inspected the wrong plane.  As noted above (see footnote 6), this argument is based on the fact that the airplane tail number noted in Rooney's affidavit in support of the criminal complaint does not match the tail number of the plane on which Hirtzinger worked.  Rooney's affidavit correctly notes the flight number, however.  Moreover, as discussed below, the affidavit contains several inconsistencies.  Rooney was obviously working in a hurry — or at least without a lot of attention to detail.  It would thus be a mistake to place too much significance on the fact that the affidavit recites the wrong tail number.  Setting that aside, however, what is critical in analyzing the issue of qualified immunity is not whether Kimball *actually* inspected the plan.  Rather, the critical question is whether Crook (the person who decided to call the TSA) had a reasonable basis for *believing* that Kimball inspected the plane.  There is no doubt that Crook had such a basis.  Crook had instructed Kimball to inspect all of Pinnacle's Milwaukee airplanes and Kimball reported to Crook that he had inspected the plane on which Hirtzinger was scheduled to fly and had found nothing wrong with its safety equipment.  Crook Dep. 16-17; Crook Aff. ¶¶ 19, 21.

Hirtzinger next argues that Pinnacle lacked a reasonable basis for suspecting him of tampering because no one from Pinnacle talked to him about their suspicions until after Crook called the TSA.  Hirtzinger argues that, under Minnesota law, it is never reasonable for an employer to accuse an employee of a crime without first personally questioning the employee.  Hirtzinger relies in particular on the following passage from *Wirig*:

---

the fact that Kimball, like dozens or hundreds of others, had access to Pinnacle aircraft.  Thus, Crook did not act unreasonably in ruling out Kimball on the basis of an interview, but deciding that a more thorough investigation of Hirtzinger was needed.

> In all cases where we have determined that probable cause existed, the evidence showed that investigative steps had been taken, including personal questioning of the affected employee, in an effort to ascertain the accuracy of statements made about the employee's conduct.

*Wirig*, 461 N.W.2d at 380; *see also Cox v. Crown Coco, Inc.*, 544 N.W.2d 490, 497-98 (Minn. Ct. App. 1996) (manager's statement that former employee had slashed her tires was not privileged where it was based purely on speculation); *James v. In Home Servs., Inc.*, No. C3-95-482, 1995 WL 479647, at *4 (Minn. Ct. App. Aug. 15, 1995) (employer's statement that employee was a convicted felon was not privileged because employer failed to take any steps to verify that information, even though it easily could have done so).

But the circumstances in *Wirig* and related cases are quite different from this case. Minnesota has recognized a qualified privilege for defamation both in the context of employers communicating about internal disciplinary matters and in the context of citizens reporting suspected criminal activity to law enforcement.  *See Lewis*, 389 N.W.2d at 890 (employer's communication of the reason for a discharge may be qualifiedly privileged); *Smits v. Wal-Mart Stores, Inc.*, 525 N.W.2d 554 (Minn. Ct. App. 1994) (good-faith reports of suspected criminal activity made to law enforcement officials may be qualifiedly privileged); *Davisson v. Engelke*, No. C0-97-265, 1997 WL 585818, at *4 (Minn. Ct. App. Sept. 23, 1997) (qualified privilege applied to defendant's report to police that plaintiff was prowling the neighborhood and peering at a neighbor's house).  Hirtzinger relies on *Wirig* and other *employment* cases to argue that an employer must always question the employee before accusing the employee of a crime.  But this case is more appropriately analyzed as a case involving a report to law enforcement of suspected criminal behavior.

In employment cases, the employer typically makes the defamatory statement as a justification for terminating the employee.  *Cf. Wirig*, 461 N.W.2d at 377; *Lewis*, 389 N.W.2d at 880; *James*, 1995 WL 479647, at *1-2.  The employer is thus communicating its final conclusion that the employee in fact engaged in the behavior of which she is accused, under circumstances in which the defamatory statement will be published to potential future employers, thus harming the employee.

By contrast, a person (whether employer or not) who reports suspicious behavior by another person (whether employee or not) to law enforcement personnel is not necessarily communicating a conclusion that the latter in fact committed a crime.  Nor is the report made under circumstances in which the defamatory statements will necessarily be made public.  Rather, a person who reports suspicious behavior may merely be calling on law enforcement to conduct a further investigation.  In these circumstances, it is not even necessary that the person have a reasonable basis for believing that a crime has actually been committed.  As the Minnesota Court of Appeals stated in *Davisson*:

> [Defendant] acted properly, as any citizen may, in calling to the attention of law enforcement suspicious conduct that he observed in his neighborhood.  The ultimate determination of what is or is not criminal conduct is for the prosecuting authorities, and finally the courts. [Defendant] could make the statements he did without having to sweat out whether or not there would be a later criminal conviction.

*Davisson*, 1997 WL 585818, at *3.

That is precisely what Pinnacle did in this case: it reported a set of suspicious circumstances to law enforcement.  And Pinnacle acted with more care than a stranger who simply calls in a report of "suspicious conduct that he observed in his neighborhood."  *Id.*

Pinnacle examined company records and found that Hirtzinger was the flight attendant on a disproportionate number of flights where safety-equipment problems were found.  After making that finding, Pinnacle put an inspection program in place, which immediately yielded evidence that Hirtzinger had tampered with equipment.  Pinnacle still did not publicly accuse Hirtzinger of anything, but instead sought help with the investigation from the TSA.  In other words, Pinnacle, like the defendant in *Davisson*, properly called on law enforcement to make the ultimate determination.  Under these circumstances, the Court holds that it was not necessary for Pinnacle to speak with Hirtzinger before asking the TSA for help.

The Court notes another significant difference between this case and the defamation cases on which Hirtzinger relies.  Those cases generally involved suspected unlawful behavior that was of little public significance.  In *Wirig*, for example, the plaintiff was suspected of stealing from his employer — conduct that affected nothing except his employer's profit margin.  Such behavior is, of course, inexcusable, but it hardly compares with the behavior suspected in this case.

Again, Pinnacle operates in the airline industry — one of the most heavily regulated industries in the world.  And Pinnacle is expected to work in tandem with the TSA and other federal authorities to ensure the safety of passengers.  Laurie Aff. Ex. R (TSA directive requiring airlines to "immediately report" all suspicious activities affecting aviation security to the TSA); Crook Dep. 37-38 (Crook is Pinnacle's liaison to the TSA and meets regularly with a TSA representative).  As described above, an airline must be given a great deal of breathing space when it conveys information regarding potential threats to the lives of passengers to the TSA.  In this context, it would be contrary to the purpose of the qualified privilege to require that an

airline interview an employee suspected of endangering passengers before the airline could seek

the assistance of the TSA — assistance that might be needed to ensure, for example, that the

interview is conducted at the proper time (perhaps after the suspected employee has been

surveilled by the TSA) or in the proper manner (perhaps by using a TSA interrogator, or a

polygraph examiner, or information gleaned from related investigations).

Hirtzinger also points out various other flaws in Crook's investigation, such as Crook's

failure to investigate other safety-equipment problems that did not involve Hirtzinger, the fact

that Garceau (the maintenance manager) was apparently out of the loop and unaware that there

was any particular problem with safety equipment, and Garceau's inability to determine whether

safety-equipment problems were due to tampering or normal wear-and-tear.  None of these

circumstances deprived Pinnacle of a reasonable basis for reporting its suspicions to the TSA.

The fact remains that Crook had evidence that Hirtzinger was likely the only one who

had access to a plane during the time in which safety equipment on that plane suffered

inexplicable damage.  Crook also had evidence of a pattern of safety-equipment problems

occurring on flights on which Hirtzinger was the flight attendant, as well as evidence that

Hirtzinger was not honest.  Pinnacle was not required to conduct an exhaustive investigation of

every safety-equipment discrepancy before bringing this information to the attention of the TSA

and seeking its assistance.

Nor is it relevant that Garceau was not more involved in the investigation.  As noted

above, Crook was eminently qualified to conduct the investigation, which fell naturally within

his purview as Pinnacle's security manager.  The fact that other Pinnacle managers acted as mere

information conduits to Crook does not cast any doubt on the reasonableness of Pinnacle's investigation.

Finally, the fact that Garceau was personally not able to tell whether particular pieces of damaged equipment resulted from tampering or normal wear-and-tear does not forever bar Pinnacle from enlisting the help of law enforcement to investigate safety-equipment problems. Under the logic of Hirtzinger's argument, if every PCE bag on every Hirtzinger flight was torn open, Pinnacle could not seek the help of federal investigators, because Garceau said that he could not distinguish between a PCE bag that had been ripped open and a PCE bag that had simply worn open.

Hirtzinger also complains of two affirmative misstatements of fact that Pinnacle allegedly made during the investigation: (1) that Hirtzinger was working on December 13 and 14 when safety-equipment discrepancies were found, and (2) that Pinnacle was unaware of any incidents of tampering on non-Hirtzinger flights. Whatever the basis Pinnacle may have had for reporting its suspicions as a general matter, Hirtzinger argues, Pinnacle lacked any reasonable basis to make those two particular false statements.

With respect to the first alleged misstatement — that Hirtzinger was working on December 13 and 14 — there is no evidence that Pinnacle *told* the TSA or anyone else that Hirtzinger worked on those dates.[10]  Rather, at the December 22 meeting in Minneapolis, Starck *asked* Hirtzinger about the safety-equipment problems that had occurred on December 13 and 14

---

[10]In particular, there is no evidence that Crook told anyone at the TSA that Hirtzinger worked on December 13 and 14.  Crook's only recollection of what he related to the TSA about events in the middle of December is that he showed Beek's spreadsheet to Rooney.  Crook Dep. 60-61.  The spreadsheet does not include any flights on December 13 and 14.  Laurie Aff. Ex. L.

(along with a number of other problems).  She had a reasonable basis for asking about those

dates, as Hirtzinger was scheduled to work on the flights that experienced problems.  Hirtzinger

immediately informed the participants in the meeting — including Starck and the TSA

representative — that he had called in sick on December 13 and 14.  Hirtzinger Dep. 181-82.  As

far as the record reflects, Starck (and everyone else at the meeting) accepted Hirtzinger's

assertion and moved on. The next day, Rooney asked Pinnacle to clarify whether Hirtzinger had

worked on December 13 and 14, and Pinnacle immediately responded that he had not.  Laurie

Aff. Exs. O, P.  It is difficult to find defamation in any of this — and difficult to understand how

Hirtzinger could have been injured even if Pinnacle *had* initially told the TSA that Hirtzinger

worked on December 13 and 14.  As the Court has held, Pinnacle had a reasonable basis for

contacting the TSA and working with the TSA to investigate Hirtzinger.  Hirtzinger has not

suggested how any specific statement about December 13 and 14 made by Pinnacle to the TSA

during the course of that investigation could have caused Hirtzinger additional damage.

 Pinnacle's second alleged misstatement — that it was not aware of any reports of

tampering outside of those connected to Hirtzinger — likewise cannot give rise to recovery for

defamation.  As noted, on December 23, after Hirtzinger's arrest, Rooney contacted Pinnacle to

ask about Hirtzinger's schedule.  Rooney also asked the following question: "Were there any

reported incidents of tampering (PEB's, D-rings, Fire extinguishers, O2, bottles & exit signs)

NOT connected to Hirtzinger?"  Laurie Aff. Ex. O.  Pinnacle's corporate counsel, Nikki Tinker,

responded as follows: "At this time we are unaware of any reports of tampering outside of those

currently being investigated.  However, please be advised that the company is presently

conducting its own investigation."  Laurie Aff. Ex. P.

Hirtzinger seems to read Tinker's statement to be an assertion that Pinnacle had not experienced any safety-equipment *problems* on non-Hirtzinger flights.  But that is not what Tinker said.  Rooney asked Pinnacle about "reported incidents of *tampering*" — that is, reports that someone had *purposely* damaged safety equipment.[11]  And Tinker replied that, outside of the suspicions that had been expressed about Hirtzinger, Pinnacle was unaware of "any reports of *tampering*."  A statement that an airline received no reports of "tampering" with safety equipment cannot reasonably be interpreted as a statement that the airline never had a "problem" with safety equipment, just as a statement from the owner of a car that the car had never been "tampered with" cannot reasonably be interpreted as a statement that the car had never suffered a mechanical problem.

Pinnacle never suggested to the TSA that it had not experienced a safety-equipment problem on a non-Hirtzinger flight.  To the contrary, Pinnacle discussed with TSA the frequency of safety-equipment problems on Hirtzinger flights as compared with the frequency of safety-equipment problems on Pinnacle flights generally.  This necessarily implied that there *were* safety-equipment problems on flights to which Hirtzinger was not assigned.  Moreover, Hirtzinger had stated at the December 22 meeting, in the presence of a TSA agent and several Pinnacle managers, that he had called in sick on December 13 and 14, when safety-equipment

---

[11]It also appears that Rooney was referring only to a single day — December 22.  As Crook testified, on and after December 22, Pinnacle's investigation became focused on the events of that one day.  Crook Dep. 52, 128-29.  Crook flew to Milwaukee solely to investigate the torn PBEs discovered on December 22, and, although Crook informed the TSA of the fact that, over time, there appeared to be a disproportionate number of incidents on Hirtzinger's flights, Crook stopped short of accusing Hirtzinger of tampering with equipment on previous flights.  Crook Dep. 22, 128-29.  In the context of the evolving focus of Pinnacle's investigation, therefore, it is evident that Rooney's reference to the "reported incidents of tampering" is a reference to the events of December 22.

incidents had occurred.  That, too, informed the TSA that Pinnacle experienced safety-equipment problems on flights on which Hirtzinger did not fly.  Finally, by no later than mid-January 2005, Pinnacle had compiled a summary of all of the safety-equipment discrepancies — some 445 — that it experienced in 2004, and this document was provided to the TSA.  *See* Stipulation as to Authenticity of Documents ¶ 1 & Ex. A [Docket No. 51] ("Stipulation"); Crook Dep. 62-63.  On this record, there is no reasonable basis for concluding that Pinnacle tried to suggest to the TSA that it never suffered safety-equipment problems on planes on which Hirtzinger was not flying.

Pinnacle also did not tell the TSA that it had concluded that none of the other safety-equipment problems had been caused by tampering.  Rather, Pinnacle told the TSA that it was "unaware of any reports of tampering outside of those currently being investigated."  As far as the record shows, that statement was *true*:  Pinnacle had not received any reports of suspected tampering, save the reports about Hirtzinger.  Although, as noted, Pinnacle had received many reports of problems with safety equipment, no one had reported that the problems were caused by tampering, nor did Pinnacle have independent reason to believe that the problems were caused by tampering.  No employee was connected to a disproportionate number of those problems, much less an employee who had given Pinnacle reason to doubt his honesty.  And no employee was implicated in a "sting" such as the one set up by Crook on December 22.

In discussing Hirtzinger's various complaints about Pinnacle's investigation, the Court in no way intends to suggest that the investigation was perfect, or that Hirtzinger was guilty.  But, as the Court described above, Pinnacle did not need to conduct a perfect investigation before asking the TSA for help.  Nor did Pinnacle need to collect enough evidence to convict Hirtzinger at a criminal trial or to persuade a jury to find him liable at a civil trial.  Rather, to be protected

by the qualified privilege, Pinnacle was required only to have a reasonable basis for its report to the TSA.  After carefully reviewing the record, the Court is satisfied that no jury could find that Pinnacle lacked a reasonable basis for contacting the TSA and seeking its assistance in investigating Hirtzinger.  The Court therefore concludes that Pinnacle's statements are protected by a qualified privilege.

### 2.  Malice

Because Pinnacle has established that it is entitled to a qualified privilege, the burden shifts to Hirtzinger to show that Pinnacle made the statements with actual malice.  *Lewis*, 389 N.W.2d at 890.  Malice is defined as "actual ill-will, or a design causelessly and wantonly to injure plaintiff."  *McBride v. Sears, Roebuck & Co.*, 235 N.W.2d 371, 375 (Minn. 1975).  Malice may be proved by evidence that the defendant knew that the statements were false or by "'extrinsic evidence of personal ill feeling, or by intrinsic evidence such as the exaggerated language of the libel, the character of the language used, the mode and extent of publication, and other matters in excess of the privilege.'"  *Frankson v. Design Space Int'l*, 394 N.W.2d 140, 144 (Minn. 1986) (quoting *Friedell v. Blakely Printing Co.*, 203 N.W. 974, 976 (1925)); *Keenan*, 13 F.3d at 1270.

Malice is generally an issue for the jury, but a court can grant summary judgment on the issue of malice if there is insufficient evidence to raise a genuine question of fact.  *Bol*, 561 N.W.2d at 150; *see also Frankson*, 394 N.W.2d at 144-45 (overturning a jury's verdict because there was insufficient evidence of malice).  Moreover, malice cannot be implied from the mere fact that a statement was inaccurate.  Otherwise, the qualified privilege would protect only true

statements — that is, statements that are not defamatory in the first place.  *Bol*, 561 N.W.2d at 150.

No reasonable jury could find that Pinnacle acted with malice in asking the TSA for assistance in investigating its suspicions about Hirtzinger.  The record contains no evidence that any of the Pinnacle managers involved in the events of December 2004 bore any ill will toward Hirtzinger; indeed, it appears that some of the managers may not have even *known* Hirtzinger.  The record also contains no evidence of Pinnacle making exaggerated or harsh statements about Hirtzinger; to the contrary, Pinnacle appears to have been careful and cautious in describing the facts.  And the record contains no evidence of excessive publication — that is, of Pinnacle sharing its suspicions about Hirtzinger with people who did not have a legitimate reason to learn of the suspicions.  Nothing in the record evidences any ill will toward Hirtzinger.

Hirtzinger, of course, disagrees.  He argues that Pinnacle's malice is evident in the fact that it concealed so much information that was favorable to Hirtzinger.  For reasons already described, no reasonable jury could conclude that Pinnacle intentionally concealed any favorable information from the TSA — much less that it did so out of a desire to harm Hirtzinger.  To elaborate on just a few points:

Hirtzinger contends that Pinnacle concealed from the TSA the fact that it had experienced safety-equipment problems on December 13 and 14, when Hirtzinger was out sick. But in the same breath, Hirtzinger complains that Pinnacle defamed him by telling the TSA that he had tampered with safety equipment on December 13 and 14.  Pinnacle obviously did not hide the fact that it experienced problems with safety equipment on December 13 and 14.  True, the

TSA was later confused about the exact timeline of events,[12] but there is no evidence that this confusion resulted from any attempt by Pinnacle to deceive the TSA.  To the contrary, the record shows that Pinnacle endeavored to correct the TSA's misunderstandings when it became aware of them — conduct that is obviously inconsistent with any inference of malice.

Hirtzinger also complains that his manager, Pelot, did not tell the TSA of her subjective belief in Hirtzinger's innocence.  But Pelot's testimony is clear that her belief was not based on anything concrete.  Instead, she simply had an intuitive feeling that Hirtzinger would not tamper with equipment.  At the same time, she also thought that the evidence pointed to Hirtzinger, and she regarded it as the TSA's job to determine Hirtzinger's guilt or innocence.  Pelot Dep. 48, 50, 52-54, 134-35.  Hirtzinger disagrees with Pelot's assessment, but that does not mean that Pelot acted out of malice.[13]

Similarly, Crook did not think letters of commendation for good customer service that Hirtzinger had received were particularly relevant to whether Hirtzinger had secretly sabotaged safety equipment.  Crook Dep. 124-25.  Again, Hirtzinger disagrees, but there is no evidence that

---

[12]In his affidavit in support of the criminal complaint, Rooney makes (in the same paragraph) the obviously contradictory assertions that (1) Hirtzinger was assigned to fly on December 13 and 14, when incidents of tampering occurred, *and* (2) Hirtzinger was not scheduled to fly from December 8 through December 18, when there were no reported incidents of tampering.  Laurie Aff. Ex. N ¶ 5.  Apparently Rooney had received some contradictory information that he had not yet been able to digest by the time he authored his affidavit.  As recounted above, however, Pinnacle responded truthfully on December 23 when Rooney asked whether Hirtzinger had worked on December 13 and 14, and Pinnacle also endeavored to compile a complete list of safety-equipment incidents, which was then turned over to the TSA.

[13]Hirtzinger also offers evidence that once, in the summer of 2004, Pelot made a remark to the effect that Hirtzinger was smelly.  Bohn Aff. ¶ 14 [Docket No. 56].  This is simply insufficient to demonstrate that Pelot intentionally concealed her opinion of his innocence out of malice.

Crook bore Hirtzinger any ill-will.  Every investigator must sort relevant from irrelevant

evidence, and nothing in the record suggests that, when Crook determined that the

commendation letters were irrelevant, he was acting out of spite.

Hirtzinger also contends that Pinnacle had an incentive to punish him for reporting

problems with safety equipment because Pinnacle suffered financial penalties when its flights

were delayed.  This, again, is rank speculation.  There is no evidence — none — that the

Pinnacle managers who took part in the investigation were motivated by financial concerns.  *Cf.*

*Frankson*, 394 N.W.2d at 144-45 (citing with approval cases holding that a plaintiff cannot

establish malice merely by claiming retaliation as a possible reason for the employer's action

without offering any evidence justifying an inference of retaliation).  To the contrary, all of the

evidence in the record is that Crook and his colleagues — whatever mistakes they may have

made — at all times were motivated by a sincere concern that Hirtzinger may have been putting

passengers in danger.

Finally, Hirtzinger notes that, after reporting him to the TSA, Pinnacle allowed him to

work a flight from Milwaukee to Minneapolis.  If Pinnacle sincerely believed that he was a

threat, Hirtzinger argues, Pinnacle would not have allowed him to fly.  There are two problems

with this argument.  First, the decision to contact the TSA was made by Crook.  Crook did not

assign Hirtzinger to the Minneapolis flight — and Crook, in fact, did not think that Hirtzinger

should have been permitted to work on that flight.  Crook Dep. 57-58.  Second, the record is not

at all clear about who did decide to ask Hirtzinger to work on the Minneapolis flight or why that

decision was made.  In light of all the other evidence demonstrating that Crook and other

Pinnacle employees were acting in good faith, and in light of the somewhat confusing and

quickly evolving events of December 22, the fact that some unknown person decided for some unknown reason that Hirtzinger should work the flight to Minneapolis is not a sufficient basis for a jury to conclude that Pinnacle was acting with malice when it reported its suspicions to the TSA.

One last point: It is tempting to judge the reasonableness of Pinnacle's actions in light of the enormous harm suffered by Hirtzinger when the government arrested him, indicted him, and placed him on the no-fly list. It is impossible not to feel sympathy for Hirtzinger, who has been humiliated, and whose livelihood has been destroyed, without the government ever having to prove the truth of the allegations against him. But Pinnacle's actions cannot be judged in hindsight. When Pinnacle called the TSA and asked for its assistance in investigating Hirtzinger, it had reasonable grounds for suspecting that Hirtzinger was tampering with safety equipment, and it had no idea that the government would act so precipitously in arresting and charging Hirtzinger. Pinnacle acted reasonably, even if the government did not, and thus Pinnacle is protected from liability by the qualified privilege. Pinnacle's motion for summary judgment with respect to Hirtzinger's defamation claim is granted.

### C. Remaining Claims

Hirtzinger also brings claims of negligent infliction of emotional distress and malicious prosecution.[14] As Hirtzinger conceded at oral argument, his emotional-distress claim cannot

---

[14]Hirtzinger's complaint includes a claim for "abuse of legal process." Compl. ¶¶ 43-44 [Docket No. 1]. In his brief, Hirtzinger refers to this claim as "abuse of legal process/malicious prosecution." Pl.'s Mem. Resp. Mot. Summ. J. 45 [Docket No. 52]. "Abuse of legal process" and "malicious prosecution" are not synonymous; they are distinct legal claims. *See Dunham v. Roer*, 708 N.W.2d 552, 571 & n.5 (Minn. Ct. App. 2006) (describing elements of a claim for abuse of process and distinguishing it from an action for malicious prosecution). It is apparent from his brief, however, that Hirtzinger is asserting only a claim for malicious prosecution. *See*

survive if his defamation claim is dismissed.  Hirtzinger cannot prevail on his defamation claim, and thus he cannot prevail on his emotional-distress claim.

Hirtzinger cannot recover for malicious prosecution unless he can prove that Pinnacle acted with malice.  *Allen v. Osco Drug, Inc.*, 265 N.W.2d 639, 645 (Minn. 1978).  It appears that the malice necessary to establish a malicious-prosecution claim may differ slightly from the malice necessary to defeat a qualified privilege asserted in defense of a defamation claim.  *See id.* at 645 n.6, 646 (upholding an instruction stating, in part, that malice "does not necessarily mean ill will or hatred toward the person accused").  It is nevertheless clear that to prevail on a malicious-prosecution claim, a plaintiff must prove, at a minimum, that the defendant knew that its actions were wrong.  *Id.* at 646.  As the discussion above makes clear, there is no basis on which a jury could conclude that Pinnacle knew that it was acting wrongly when it reported its suspicions to the TSA.  Hirtzinger's malicious-prosecution claim is therefore dismissed.

---

Pl.'s Mem. Resp. Mot. Summ. J. 45 (describing elements of a malicious-prosecution claim).

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS

HEREBY ORDERED THAT:

1.      Defendant's motion for summary judgment [Docket No. 45] is GRANTED.

2.      Plaintiff's complaint [Docket No. 1] is DISMISSED WITH PREJUDICE AND

ON THE MERITS.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: March 27, 2008               s/Patrick J. Schiltz
                                        Patrick J. Schiltz
                                        United States District Judge